**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | |
|---|---|
| In re: Zimmer NexGen Knee Products Liability Litigation | MDL Docket No. 2272<br><br>ORAL ARGUMENT REQUESTED |

**BRIEF OF ZIMMER ENTITIES[1] IN
OPPOSITION TO PLAINTIFF FRED STONE'S MOTION FOR CONSOLIDATION
AND TRANSFER OF ACTIONS TO THE NORTHERN DISTRICT OF ILLINOIS
OR ANOTHER MORE APPROPRIATE JURISDICTION**

The twenty-eight lawsuits that Plaintiff Fred Stone ("Stone") seeks to centralize relate to eight different products with eight different designs, at least six different large sets of design history documents created by different design development teams, and at least eight different regulatory approval applications. Multiple theories of defect go with these multiple products. Even worse, Stone's proposed scope for this MDL would expand that eight to over forty different products, each of which a transferee judge would be forced to deal with separately.

Centralization would create no net efficiency here. The transferee judge would start with the usual burden of administering individualized discovery about each plaintiff — a large task in any MDL. This case differs from proper MDLs in the next burden it imposes: discovery and motions not about a single product, but about at least eight different products requiring separate discovery segregated by plaintiff groups, regarding voluminous and often confidential trade secret information. Even allowing for minor factual overlap, this case would impose at least six times the product discovery burden of a typical product MDL, plus the unique burden of dividing

---

[1] Zimmer, Inc., Zimmer Holdings, Inc., Zimmer Orthopaedic Surgical Products, Inc., Wilson/Phillips Holdings, Inc., d/b/a Zimmer Wilson/Phillips, Orthopaedic Technologies, LLC, d/b/a Zimmer Tri-State (incorrectly named as (1) Zimmer Tri-State, d/b/a Tri-State Orthopaedic, (2) Zimmer Tri-State, d/b/a Zimmer, Inc., and/or (3) Zimmer Tri-State, d/b/a Tri-State Orthopedic), and K. Michael Melia, d/b/a Zimmer Melia & Associates, Inc. (incorrectly named as Zimmer Melia & Associates, Inc.) (collectively "Zimmer").

up the claims into at least six buckets and implementing measures to protect Zimmer's trade secret information from leaking from bucket to bucket.

The twenty-eight lawsuits proposed for centralization (the "Lawsuits") involve at least these eight products.

| Product Alleged as Defective[2] | Lawsuits Identified by Plaintiff's Last Name |
|---|---|
| 1. CR-Flex Porous Femoral Component | *Cavada, Malee, Pancotto, Wahlman* |
| 2. CR-Flex Precoat Femoral Component | *Carr, Cleveland, Gangloff* |
| 3. Gender Solutions CR-Flex Precoat Femoral Component | *Sizemore* |
| 4. LPS-Flex Precoat Femoral Component | *Campbell, Davis, Effler, Fitzpatrick, Hanson, Holder, Krammes, Ritter, Root, Saucedo, Stone, Vargas* |
| 5. LPS-Flex Option Femoral Component | *Singsaas* |
| 6. LPS Femoral Component[3] | *Langevin* |
| 7. Gender Solutions LPS-Flex Femoral Component | *Anderson, Coleman, Holder, Hasse-Jungkurt* |
| 8. MIS Tibial Component[4] | *Anderson,*[5] *Cozzolino, Gangloff, Krammes, Poser, Vargas, Singsaas* |

---

[2]   Zimmer confirmed the products at issue in each lawsuit using the allegations contained in the plaintiffs' complaints.  Furthermore, in some cases, discovery or Zimmer's investigation have revealed additional product identifying information.

[3]   The product at issue in *Langevin* is an LPS Femoral Component.  It is **not** a flex-design — the common link that Stone argues justifies consolidation.

[4]   This product's full name is "MIS Total Knee Procedure Stemmed Tibial Component Fixed Bearing Precoat."  For the sake of simplicity, Zimmer will abbreviate the product name to "MIS Tibial Component."  While Plaintiff's Motion To Consolidate brief focuses mainly on the MIS Tibial Component, which it incorrectly refers to as simply the "MIS Tibial," Zimmer's *NexGen®* line of products actually includes at least **fourteen** other tibial components.

These products were designed by six different design teams that created six different sets of design history documents. Discovery of these design teams and documents will overlap little and will require separate administration. When the first step a transferee judge must take after the transfer and centralization of cases involves a comprehensive decentralization of those cases, it follows that the centralization never should have occurred in the first place.

For this reason, the Panel has noted that product liability lawsuits involving many different products are often not conducive to MDL treatment. *See, e.g., In re Children's Personal Care Products Liab. Lit.*, 655 F. Supp. 2d 1365, 1366 (J.P.M.L. 2009); *In re Ambulatory Pain Pump-Chondrolysis Products Liab. Lit.*, 709 F. Supp. 2d 1375, 1377 (J.P.M.L. 2010); *In re Victoria's Secret Undergarments/Intimate Apparel Products Liab. Lit.*, 626 F. Supp. 2d 1349, 1350 (J.P.M.L. 2009). The Panel should deny Stone's Motion To Consolidate and avoid the delays and inefficiencies created by centralization of unrelated lawsuits.

## I.  STATEMENT OF FACTS[6]

**A.  Total Knee Replacement Surgery**

In total knee replacement surgery, a surgeon removes the portions of the bones in the knee that are damaged and resurfaces the internal knee surfaces with plastic and metal implants. The implants are intended to help restore joint mobility and relieve pain. Every total knee prosthesis includes a tibial plate (or "tray"), a femoral component, and a weight-bearing plastic insert between the two ("tibial insert" or "articulating surface"). The tibial tray attaches to the top of the lower leg bone (tibia). The femoral component attaches to the bottom of the upper leg

---

[5]  Plaintiff Sandra Anderson also alleges defects in the All Polyethelene Patella and *Palacos*® Bone Cement implanted during her surgery — two more potential products.

[6]  Zimmer respectfully submits at Exhibit 1 the Affidavit Of Michelle Zawadzki, a Zimmer employee who summarizes the differences among the eight products now at issue and explains the different universes of documents and witnesses relating to each.

3

bone (femur).  The articulating surface, made of high-grade polyethylene, snaps into the tray and provides the surface on which the femoral component rotates or articulates.  In addition, each implant includes a replacement kneecap (patella).  *See* illustration below.



**B.   The Twenty-Eight Lawsuits Involve Different Knee Replacement Products With Different Functions And Unique Designs Used To Replace Different Bones**

Plaintiff seeks to combine twenty-eight lawsuits and "hundreds if not thousands" of supposed additional lawsuits.  (Brief In Support Of Plaintiff Fred Stone's Motion For Centralization And Transfer Of Actions To The Northern District Of Illinois Or Another More Appropriate Jurisdiction, Docket No. 1-1, filed June 6, 2011 ("Pl's. Brief," p. 2).)  The patients at issue in the pending lawsuits allegedly have undergone knee replacement surgery including a *NexGen*® branded product.  To be clear, "NexGen" refers not to a product, but to a line of over forty different products that surgeons choose from in replacing knees.  Zimmer introduced the first *NexGen*® branded product in 1995, after more than two decades' of experience with modern knee replacement products.  To accommodate widely varying patient medical needs and orthopaedic surgeons' different surgical philosophies, surgical and fixation techniques, and technical design preferences, Zimmer developed the more than forty distinct knee replacement

4

products that carry the *NexGen®* brand.  A surgeon may implant one or more of these forty femoral, tibial, tibial articular surface, and patella components.

Plaintiffs in the twenty-eight lawsuits underlying this proceeding challenge at least eight different products: one tibial tray and seven different femoral components.  In addition, the plaintiff in *Anderson v. Zimmer, Inc., et. al,* has placed two more products at issue: one patella component and the bone cement used by the surgeon who implanted the products.  All of these products have starkly different functions.  Femoral components are designed to replace the lower portion of the femur; tibial components are designed to replace the upper portion of the tibia; and, patellar components replace kneecaps.  The discovery needed to prove a defect in a tibial component — such as design prints and manufacturing records — will have little or no overlap with the discovery needed to prove a defect in a particular femoral component, for which Zimmer maintains a separate set of documents.

Comparison of the seven femoral components already at issue here reveals differences among them that are just as significant.  Three core design characteristics separate Zimmer's femoral components:

(1)   each product's design requires either the preservation or removal of the patient's posterior cruciate ligament;

(2)   each product's bone-facing surface is precoated for fixation with cement, or is porous and uncoated for use without cement; and

(3)   some components are designed solely for the treatment of women and their unique knee anatomy.

Each component incorporates one or more of these design characteristics and others to create a unique product.  The designers for each product, and documents Zimmer maintains for each

5

product — including design documents, manufacturing records, and regulatory documents — vary between the products in multiple respects.

### 1. Cruciate-Retaining Knees vs. Posterior Stabilizing Knees

Zimmer's knee replacement products accommodate two different surgical techniques, removing or retaining the patient's posterior cruciate ligament. The cruciate retaining method can only be used in patients with a healthy posterior cruciate ligament, which some patients lack. Zimmer femoral products for these procedures are designated as "CR" components, and they are designed to be used only in the presence of a healthy posterior cruciate ligament.

In procedures where a patient lacks a healthy posterior cruciate ligament, the ligament is damaged during surgery, or the surgeon otherwise elects not to retain the ligament, Zimmer "LPS" femoral components may be used.[7] LPS femoral components are structured to compensate for the removal of the patient's posterior cruciate ligament. A cam/spine mechanism in the LPS femoral component and corresponding articular surface provides the stability formerly supplied by the posterior cruciate ligament. The unique design of Zimmer's LPS products provide stability to the patient's knee, and LPS femoral components cannot be used with CR components.

Of the seven femoral component products related to the claims in the Lawsuits, **three** are CR knees and **four** are LPS knees.

### 2. Product Finish And Fixation: Porous vs. Precoat

Zimmer's femoral components also are distinguished by the finish of their bone-facing surfaces, which relate to the implant's method of fixation. Because the Motion For Consolidation alleges that one or more of Zimmer's femoral components are plagued by "looseness," the adequacy of a product's fixation will become a principal issue during discovery.

---

[7] LPS stands for Legacy Knee Posterior Stabilized.

6

Femoral components with a precoat finish are fixed into place using cement.  In contrast, femoral components with a porous finish do not require the use of cement for fixation.  Porous femoral components bond when the patient's bone grows into the porous finish of the implant.  Of the seven different femoral component products implicated in the Lawsuits, **five** have precoat finishes that require the use of cement, while **one** has a porous finish that does not require cement.  One of the femoral components, the LPS-Flex Option, can be implanted with or without the use of cement.

      3.      **Gender-Specific Components**

In 2005, Zimmer launched its Gender Solutions line of femoral components.  In recognition of the anatomical differences between male and female patients, the Gender Solutions femoral components include several key design distinctions, including (a) a different and narrower width dimension; (b) a different "Q-Angle" within which the patella tracks; (c) a deeper groove for patella tracking; and (d) a different implant height.  These engineering features accommodate the smaller, more trapezoidal shape of a female femur.  Of the seven different femoral component products implicated in the Lawsuits, only **two** include a gender-specific design.  The other **five** do not.

      4.      **Stone's Cited Evidence Highlights The Factual Diversity Of The Cases Proposed For Centralization**

For his claim of common defect, Stone relies heavily on a June 19, 2010, *New York Times* article about a report given by Richard Berger, M.D.  According to Stone, the *New York Times* article "detail[ed] a high rate of failure among **components making up the Zimmer NexGen knee implant devices**, used in hundreds of thousands of knee replacement surgeries

7

worldwide." (Pl's. Brief, pp. 1-2, 15) (emphasis added).[8] However, the author of the article cites to Dr. Berger's experience implanting a single *NexGen®* product, the CR-Flex Porous Femoral Component — just **one** of the eight knee products at issue in the Lawsuits. Stone implies that Dr. Berger's talk (or the *New York Times* article that mentions it) somehow will be relevant in all of the Lawsuits. In fact, the CR-Flex Porous Femoral Component mentioned by Dr. Berger is implicated in only **four** of the Lawsuits. *See* chart, *supra*, p. 2.

Tellingly, Stone also cites studies[9] for other single products, including the LPS-Flex Precoat Femoral Component, which was the subject of a Korean study, and a tibial product, which was the subject of a 2010 presentation by a physician from Texas. (Pl.'s Brief, pp. 6-7.) Thus, the evidence Stone presents addresses only **three** of the eight products now at issue, and he presents no evidence suggesting any common defect even among those three.

Stone next discusses a purported "Class II Recall" of the "Zimmer NexGen MIS Tibial." (*See* Pl.'s Brief, pp. 2-3.) The event he refers to was not a "recall" in the common sense of that term. Instead, Zimmer changed the instructions and warnings as to only one of the at least fifteen different tibial components Zimmer offers for knee replacement surgeries: the MIS Tibial Component. Though Stone devotes a sizeable portion of his brief discussing this FDA action, the facts surrounding the action have no relevance whatsoever to twenty-one of the twenty-eight lawsuits proposed for centralization; only **seven** of the Lawsuits involve the MIS Tibial Component.

---

[8] Even if the Panel were to accept Stone's invitation to base a judicial decision on "evidence" from a newspaper article, the Panel should reject Stone's inaccurate portrayal of the article's contents.

[9] Dr. Berger's was not a peer-reviewed study but only a report of experience at his own hospital.

8

Moreover, much broader national registry data covering all *NexGen®* branded products reflect industry-leading performance and rebut any suggestion of defect that Stone asks the Court to draw from these isolated reports.

In short, Stone's own authorities reveal not a common defect theory, but an incomplete patchwork covering fewer than half the products at issue and demonstrating no meaningful common thread.

**5.     Discovery On Each Product Will Be Largely Unique**

The Affidavit Of Michelle Zawadzki (Exhibit 1) details the differences among the documents and witnesses for each product.  For example, evidence regarding the design and manufacture of a CR-Flex Porous Femoral Component will be different from that regarding a Gender Solutions LPS-Flex Femoral Component.  Affidavit Of Michelle Zawadzki ("Zawadzki Aff.") at ¶¶ 10-22, These eight products were designed by six different teams creating six different sets of design history documents: (1) CR Flex-Fixed Femoral Components, (2) LPS Flex-Fixed Precoat and Option Femoral Components, (3) LPS Flex-Fixed Porous Femoral Component, (4) Gender Solutions Precoat CR Flex and Gender Solutions Option LPS Femoral Components, (5) Gender Solutions Porous CR Flex and Gender Solutions Porous LPS Flex Femoral Components, and (6) MIS Tibial Component.  Zawadzki Aff. at ¶ 12.  The product files and relevant witnesses for these six teams are different, just as the products' relevant features are different — porous vs. precoat, cruciate-retaining vs. cruciate-sacrificing (replaced by a cam and spine), and female design vs. gender-neutral design.  Zawadzki Aff. at ¶¶ 8-22.

As the various plaintiffs focus their discovery efforts on these different design characteristics, the discovery paths in the cases proposed for centralization will multiply and no efficiency will result.

9

    **C.**    **The Distinctions Among The Eight Products At Issue Will Cause Different Plaintiffs To Pursue Different Theories Of Defect And Liability**

Beyond the differences in the evidence sets relating to each product, there lies another source of non-common discovery: the necessarily-different theories of liability in these cases. Stone acknowledges that there "there are several models of high-flex knees" at issue in the Lawsuits. (Pl.'s Brief, p. 6.) Stone attempts to minimize the ramifications of the differences in these products, asserting that "[t]o the extent that there are differences among the models" at issue in the Lawsuits, "the same allegations and liability theories apply to each component." (*Id.*) This is not so. The key product distinctions identified above necessarily will result in different theories of defect, requiring different evidence, creating even more variation in the discovery at issue in the Lawsuits.

As an initial matter, the proposed MDL would consist of lawsuits divided between products used to treat entirely different bones: femurs and tibias. In cases implicating the MIS Tibial Component, discovery presumably will focus on whether there was a deficiency in the component's instructions and product warnings, which were the subject of the United States Food & Drug Administration action cited in Plaintiff's Brief. (Pl.'s Brief, p. 3.) However, discovery related to a deficiency in those instructions and warnings will have no relevance in the claims regarding the femoral components. These divergent theories will necessarily require different discovery and the production of different categories of documents.

As noted above, Stone cites three different reports each relating to one of the eight products now at issue, with no hint of common theory of defect.

The multiple design characteristics that differentiate Zimmer's various femoral components will drive further differences among defect theories and evidence. For example, Plaintiff Sandra Anderson in the *Anderson v. Zimmer, Inc., et al.*, matter also argues that there

10

are defects in the bone cement used during her surgery, which places the cement and method of use at issue. Obviously such issues do not arise in cases of non-cemented components.

## II.     LEGAL ANALYSIS

This case fails the statutory test: it does not share sufficient "common questions of fact" to ensure that the transfer will "be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). The Lawsuits here share few if any meaningful common issues of fact, and consolidation would create significant net **in**efficiencies by requiring the transferee court to segregate and referee pretrial proceedings on at least eight different products.

Centralization is warranted in some single product cases. *In re Zimmer Durom Hip Cup Products Liab. Lit.*, 717 F. Supp. 2d 1376, 1378 (J.P.M.L. 2010). However, the Panel has repeatedly recognized that "[a]ny common issues . . . are overshadowed by the non-common ones" in certain multiple product cases. *In re Children's Personal Care Products Liab. Lit.*, 655 F. Supp. 2d 1365, 1366 (J.P.M.L. 2009) (denying centralization where lawsuits involved "different baby products with differing formulations"); *accord Ambulatory Pain Pump-Chondrolysis Products Liab. Lit.*, 709 F. Supp. 2d 1375, 1377 (J.P.M.L. 2010) (denying centralization in part because the multiple products at issue "come in different sizes and designs, with differing volume, duration, and flow capacities"); *In re Victoria's Secret Undergarments/Intimate Apparel Products Liab. Lit.*, 626 F. Supp. 2d 1349, 1350 (J.P.M.L. 2009) (denying centralization because the array of products at issue created a likelihood that "discovery will vary among the actions").

Here, there is no common fact issue significant enough to create efficiencies of centralization more important than its burdens. In all MDLs those burdens include: (1) the "considerable time and trouble . . . involved in the sheer mechanics of transferring and

11

remanding" the cases; and (2) the difficulties and costs that arise from separating the individual issues from the common issues.  *See generally In re Concrete Pipe,* 302 F. Supp. 244, 254-56 (J.P.M.L. 1969) (Wiegel, J., concurring) (outlining burdens inherent to centralization and recognizing burdens of transfer often outweigh the benefits).

In this case, those common burdens are only the beginning.  A transferee judge here would need to compartmentalize the twenty-eight lawsuits into at least eight different divisions in accordance with the differences in the products' functions and designs, as well as the diverse and possibly conflicting theories of defect and liability likely to arise from these product differences.  He or she would then have to administer each of these divisions, and keep order among them.  This is not the efficiency and convenience that Section 1407 contemplates.

**A.     Centralizing The Lawsuits Would Create Unnecessary Delays, Overcomplicate Discovery, And Overburden The Transferee Judge**

Stone claims in conclusory fashion that the Lawsuits "share the same basic theory of liability, and the same basic factual allegations" and that "[a]ll of the cases will involve the same core of lay and expert witness and document discovery."  (Pl.'s Brief, p. 9.)  He does not share this supposed multi-product theory of liability, or supposed multi-product discovery, with the Panel.  Stone then recites that centralization will "permit the transferee court to manage discovery justly and efficiently; eliminate duplicative discovery; and avoid conflicting rulings on issues like the scope, timing, and form of discovery."  (Pl.'s Brief, p. 11.)  Stone fails to provide, however, any concrete examples, or even an explanation, of how centralization might work in this case, given the material inefficiencies arising from the necessity to do everything at least eight times.

12

Centralization of the Lawsuits would combine the administrative and procedural burdens present in all MDLs ("the necessary inconveniences of transfer and remand," *In re Concrete Pipe*, 302 F. Supp. at 255), with problems peculiar to this eight-product MDL:

(1) Delay as the various district courts transfer their matters to the transferee judge;

(2) Briefing, argument, analysis, and decision regarding how to separate the MDL into eight separate divisions according to the products at issue;

(3) Litigating and deciding which of the hundreds of thousands of confidential product design documents and dozens of witness depositions will be relevant to each of the separate product buckets; and

(4) supervising the scheduling and taking of some of the plaintiff-specific depositions, each relating to only one plaintiff's suit.

**1. Because The Proposed MDL Involves Eight Different Products, Centralization Would Excessively Complicate The Discovery Process And Overburden The Transferee Judge**

In products liability cases, nearly all fact discovery can be divided into two categories: product-specific discovery and plaintiff-specific discovery. Typically, product-specific discovery is produced by the defendant-manufacturer and includes documents related to the design, development, manufacture, regulatory approval, marketing, and sale of the product at issue, as well as depositions of the defendant's employees responsible for the product in question. By contrast, plaintiff-specific discovery is provided by the plaintiff and his or her medical providers. Plaintiff-specific discovery includes documents relevant to the plaintiff's medical history, alleged injury, prognosis, and monetary damages, as well as depositions of the plaintiff, the plaintiff's medical providers, and other witnesses with knowledge of plaintiff's alleged injuries. Plaintiff-specific discovery necessarily varies from case to case. The plaintiffs have different medical histories, ages, weights, genders, bone conditions, activity levels, and myriad

13

other patient factors that influence the performance and outcome of their surgeries. The plaintiffs will also have been treated by different surgeons from all parts of the country — surgeons with different surgical philosophies and techniques for knee replacement.

Differences like these notwithstanding, the Panel sometimes centralizes products liability cases nonetheless where there is real efficiency to be had from near-identity of the **product-specific** discovery. *See, e.g., In re Zimmer Durom Hip Cup Products Liab. Lit.*, 717 F. Supp. 2d 1376, 1378 (J.P.M.L. 2010) (noting that while "the actions certainly present some individual issues, this is usually true of device cases"). In that case, the Panel found significant that the "paramount issues" in the case "concern[ed] the design, manufacture, testing, and marketing **of a single medical device . . .** " *Id.* (Emphasis added.)

By contrast, the Panel has recognized that "[a]ny common issues . . . are overshadowed by the non-common ones" in several proposed multiple product scenarios. *In re Children's Personal Care Products Liab. Lit.*, 655 F. Supp. 2d 1365, 1366 (J.P.M.L. 2009) (denying centralization where lawsuits involved "[m]ore than ten different baby products with differing formulations"); *accord In re Ambulatory Pain Pump-Chondrolysis Products Liab. Lit.*, 709 F. Supp. 2d 1375, 1377 (J.P.M.L. 2010) (denying centralization in part because the multiple products at issue "come in different sizes and designs, with differing volume, duration, and flow capacities); *In re Victoria's Secret Undergarments/Intimate Apparel Products Liab. Lit.*, 626 F. Supp. 2d 1349, 1350 (J.P.M.L. 2009) (denying centralization because the multiple products will cause discovery to "vary among the actions"). In these cases, variation occurs with respect to both product-specific **and** plaintiff-specific discovery. *See, e.g., In re Ambulatory Pain-Pump Chondrolysis Products Liab. Lit.*, 709 F. Supp. 2d at 1377 (citing both product differences and

14

the plaintiffs' "different medical histories" in denying centralization). The net benefit of centralization is lost.

Here, the product-specific discovery in the proposed MDL will vary widely among the Lawsuits. Zimmer maintains six separate sets of design history documents for these eight products, at least eight different 510(k) regulatory applications and files, and six or more different groups of strategic marketing materials. Zawadzki Aff. at ¶¶ 16-22. By way of specific example, the comprehensive design history file related to the CR-Flex Porous Femoral Component will have no relevance or value in a lawsuit alleging a defect in the MIS Tibial Component. The same predicament would plague deposition discovery. Different products were developed at different times by different Zimmer design teams comprised of different Zimmer employees. Zawadzki Aff. at ¶ 12. Hence, the deposition testimony of a witness with knowledge of the development of one Zimmer product will have little to no relevance in an action alleging a defect in another product.

Stone has failed to meet his burden of showing that "the efficiencies that might be gained by centralization would not be overwhelmed by the multiple individualized issues (including ones of liability and causation) that these actions appear to present." *In re Shoulder Pain Pump-Chondrolysis Products Liab. Lit.*, 571 F. Supp. 2d 1367, 1368 (J.P.M.L. 2008).

### 2.  Centralization Would Unfairly Frustrate Zimmer's Ability To Defend Its Products

The Panel has recognized that transferring lawsuits from around the country to one transferee court involves "[c]onsiderable time and trouble." *In re Concrete Pipe,* 302 F. Supp. at 254. Transfer will delay, not hasten, these cases. *See id.* at 255 (noting Panel's need to determine whether delay will result from transfer). When lawsuits involve a single product and one or more meaningful common fact issues, centralization can create simplicity. However,

15

where (as here) numerous products are involved and there are no meaningful common issues of fact, the potential for unwarranted delay increases, and the adverse side effects of centralization become increasingly important.[10]

For Zimmer, the costs of delaying the progress in these lawsuits are significant.  For more than seven months lawyers have waged national advertising campaigns designed to persuade implant recipients, falsely, that *NexGen®* branded knee products suffer from defects that cause serious injuries.  That campaign has forced Zimmer to file an action to protect its products and its reputation.[11]  Realistically, however, until courts begin to resolve these issues on the merits, the advertisements will likely continue and will generate additional baseless claims.[12]

---

[10]   "These rules . . . should be construed and administered to secure the just, speedy and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1.

[11]   In *Zimmer Inc. v. Kresch, et al.*, Case No. 3:11-cv-00063, United States District Court for the Northern District of Indiana, South Bend Division, Zimmer seeks damages and to enjoin certain plaintiffs' law firms from continuing that campaign.  Zimmer also maintains a fact-based website that corrects the advertising campaign's misleading assertions: *www.zimmerfacts.com*.  In response to Zimmer's lawsuit, at least four plaintiffs' personal injury law firms have admitted that their advertisements were baseless.  These firms have already issued public retractions correcting their misstatements about the Zimmer *NexGen®* Knee System.  *www.zimmerfacts.com/background*.

[12]   Such delay would be greatest in those lawsuits in which significant discovery has begun.  In one lawsuit, *Anderson v. Zimmer, Inc., et al.*, Zimmer's discovery is nearly complete.  The parties have deposed the plaintiff and both the implanting and explanting surgeons, in addition to exchanging written discovery.  Defendant Zimmer, Inc.'s Motion For Protective Order – seeking protection from Anderson's overbroad discovery – also is pending before the *Anderson* court.  Document discovery has also begun in at least two other matters, *Sizemore v. Zimmer, Inc., et al.*, and *Singsaas v. Zimmer, Inc., et al.*  Likewise, in *Effler v. Zimmer, Inc., et al.*, the court conducted a scheduling conference and the parties await a scheduling order.  Zimmer, Inc., also has served written discovery on the plaintiff.  In *Langevin*, the parties have conducted their Rule 26(f) conference, have informally supplied medical records, and have filed a proposed scheduling order with the Court.  By the time Stone's petition reaches decision, many lawsuits likely will be in the midst of discovery, providing further justification for denying Plaintiff's Motion To Consolidate.  *See In re Ambulatory Pain Pump-Chondrolysis Products Liab. Lit.*, 709 F. Supp. 2d 1375, 1378 (J.P.M.L. 2010) (noting that varying stages of discovery weigh against centralization).

Because centralization would frustrate the efficient disposition of the Lawsuits, Zimmer respectfully requests that the Panel deny the Motion To Consolidate.

### 3. Centralization Would Generate Additional Baseless Claims Involving Even More Zimmer Knee Products

The Panel should not overlook one further cost of centralization: it would likely generate more baseless claims about additional Zimmer products. By raising the profile of the claimed generic product defect, centralization would confer legitimacy on the claim, particularly in lay eyes unfamiliar with the procedural nuances of Section 1407. Centralization would grant the plaintiffs' bar a powerful argument it would use in television, print and internet advertising. Here, many months into an advertising campaign that has still generated fewer only about 60 claims deemed worthy of federal filing, the Panel should be particularly wary of the "if we build it they will come" subtext of Stone's petition.

At the time of the filing of this Brief, the Panel had received notice of six additional tag-along actions. Two of these six actions, *Needham v. Zimmer, Inc., et. al.*, and *Taylor v. Zimmer, Inc., et. al.*, involve two products in addition to the eight identified in the cases originally proposed for centralization: a Zimmer Gender Solutions Natural-Knee Flex Articular Surface (*Needham*) and a Zimmer Gender Solutions Natural-Knee Flex System (*Taylor*). Already the eight-product case has grown to a ten-product case.

More troubling, however, is that these two additional products are not even *NexGen®* products, and in one of the cases, *Taylor*, the Complaint contains no allegation that the plaintiff has even required a revision surgery. Though the Panel may accept the inevitability that an MDL will result in the filing of spurious litigation in some single-product cases where the efficiencies of centralization are otherwise clear, where as here the opportunities for efficiency

17

are limited the negative effects of the increased profile resulting from MDL treatment weigh against consolidation.

**B.     There Is A More Efficient Way To Achieve the Goals of § 1407 Within The Existing Lawsuits**

The Panel has reminded litigants that an MDL is not the only method available for reducing duplicative discovery or addressing the convenience of parties and witnesses.  After denying centralization in *In re Children's Personal Care Products Liab. Lit.*, the Panel explained that:

> [T]he parties could employ the same notices for depositions, interrogatories and requests for production in all actions, thereby making them applicable in each action; the parties could seek to agree upon a stipulation that any discovery relevant to more than one action is usable in all those actions; and any party could seek orders from the involved courts to coordinate their pretrial efforts.

655 F. Supp. 2d 1365, 1366 (*citing*, *inter alia*, *Manual For Complex Litigation*, Fourth, § 20.14 (2004)).

Zimmer commits to these alternatives in the Lawsuits where they would streamline discovery while protecting Zimmer's trade secrets and other confidential information.  For instance, Zimmer is willing to allow the core, product-specific document discovery that it produces in one lawsuit to be used in other lawsuits implicating the same product, subject to the appropriate protections for confidential information.  Furthermore, many of the Lawsuits involve the same plaintiffs' attorneys.  Zimmer will work with these attorneys to schedule depositions of Zimmer employees for multiple cases involving the same product.

These steps will minimize the potential for duplicative discovery and maximize convenience for all parties.

### C. Should The Panel Elect To Grant The Motion To Consolidate, The Panel Should Centralize The MDL Before Judge Robert L. Miller, Jr. Of The Northern District Of Indiana

Finally, should the Panel grant transfer, Zimmer respectfully requests that the Panel select the United States District Court for the Northern District of Indiana, South Bend Division, as the transferee forum, and the Honorable Robert L. Miller, Jr. as the transferee judge.

The Panel typically considers the location of the parties, witnesses, and documents in selecting a transferee forum. *See, e.g., In re Express Scripts, Inc., Pharmacy Benefits Mgmt. Lit.*, 368 F. Supp. 2d 1356, 1357 (J.P.M.L. 2005); *In re Thaxton Group, Inc. Sec. Lit.*, 323 F. Supp. 2d 1374, 1375 (J.P.M.L. 2004). Because the plaintiffs in these cases are geographically diverse, no single district would be convenient for all of them. However, the plaintiffs in several cases reside in Illinois, and their counsel are located in or near Chicago, Illinois – approximately two hours from South Bend, Indiana, where Judge Miller's court is located. Zimmer is headquartered in Warsaw, Indiana, which is a one-hour drive from South Bend, Indiana. Centralization before Judge Miller would be convenient for many plaintiffs, their counsel, and the numerous Zimmer witnesses likely to be at issue. Centralization before Judge Miller also would create great proximity to product-specific documents likely to be produced in the Lawsuits. As a former member of this Panel, Judge Miller is well-versed in MDL proceedings. Furthermore, Judge Miller currently presides over *Zimmer, Inc. v. Ari Kresch, et al.*, Cause No. 3:11-CV-00063-RLM-CAN, which addresses the misleading advertising that presumably resulted in many of the Lawsuits. Accordingly, Judge Miller already is familiar with some of the products and factual allegations at issue. For these reasons, Zimmer respectfully submits that the Northern District of Indiana, South Bend Division, would provide the most appropriate venue, and Judge Miller should preside over any MDL created for the Lawsuits.

### III. CONCLUSION

A transferee court here would face at least six times the burden as in a single product case. The certainty of variation in both product-specific discovery and plaintiff-specific discovery makes centralization before one judge untenable.

BAKER & DANIELS LLP


/s/ Joseph H. Yeager, Jr.

Joseph H. Yeager, Jr. (Ind. State Bar #2083-49)
300 North Meridian Street, Suite 2700
Indianapolis, IN  46204
Telephone:   317-237-0300
Fax:              317-237-1000
Email:   jay.yeager@bakerd.com

*Attorneys for Zimmer, Inc., Zimmer Holdings, Inc., Zimmer Orthopaedic Surgical Products, Inc., Wilson/Phillips Holdings, Inc., d/b/a Zimmer Wilson/Phillips, Orthopaedic Technologies, LLC, d/b/a Zimmer Tri-State (incorrectly named as (1) Zimmer Tri-State d/b/a Tri-State Orthopaedic, (2) Zimmer Tri-State d/b/a Zimmer, Inc., and/or (3) Zimmer Tri-State d/b/a Tri-State Orthopedic), and K. Michael Melia, d/b/a Zimmer Melia & Associates, Inc. (incorrectly named as Zimmer Melia & Associates, Inc.)*